1             IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION

3  UNITED STATES OF AMERICA,    )
                        )
4             Plaintiff,   )  CRIMINAL ACTION FILE
           v.          )  NO. 1:20-CR-00408
5                        )
  EDUARDO GUTIERREZ,        )
6                        )
             Defendant.   )
7  _____)

8

9
  ----------------------------------------------------------
10
          BEFORE THE HONORABLE MICHAEL L. BROWN
11            TRANSCRIPT OF PROCEEDINGS
               AUGUST 25, 2021
12
  ----------------------------------------------------------
13
  APPEARANCES:
14
  For the Plaintiff:       OFFICE OF THE U.S. ATTORNEY
15                    (By:  C. Brock Brockington)

16  For the Defendant:       BONDURANT, MISXON & ELMORE, LLP
                     (By:  Kamal Ghali)
17

18
       Proceedings recorded by mechanical stenography
19       and computer-aided transcript produced by

20
       JANA B. COLTER, FAPR, RMR, CRR, CRC
21           Official Court Reporter
           1949 U.S. Courthouse
22         75 Ted Turner Drive, SW
           Atlanta, Georgia  30303
23           (404) 215-1456

24

25

```
 1                        _  _  _

 2                   P R O C E E D I N G S

 3        (Atlanta, Fulton County, Georgia, August 25, 2021, in

 4    open court.)

 5

 6            THE COURT:  All right.  So we are here, I understand,

 7    for a change of plea in United States v. Eduardo Gutierrez.

 8            Is that right?

 9            MR. BROCKINGTON:  That is correct.

10            THE COURT:  All right.  Can I have appearances

11    starting with counsel for the government?

12            MR. BROCKINGTON:  Good afternoon, Your Honor.  Brock

13    Brockington for the United States.

14            Seated at counsel table is Drug Enforcement

15    Administration Special Agent Bruce Hernandez.

16            THE COURT:  Great.

17            And for the defendant?

18            MR. GHALI:  Kamal Ghali of Bondurant, Mixson & Elmore

19    on behalf of the defendant, Your Honor.

20            THE COURT:  Nice to see you.

21            MR. GHALI:  Good to see you.

22            THE COURT:  All right.  We have an interpreter.

23            Do we need to swear in Mr. Hoover?

24            COURTROOM DEPUTY:  No, sir, we don't.

25            THE COURT:  All right.  Great.
```

1    Mr. Gutierrez, I understand that it is your intention
2 to enter a plea today.
3    Is that right?
4    THE DEFENDANT:  Yes.
5    THE COURT:  I understand that you are going to enter
6 a plea to Count One of the indictment in this case.
7    Is that right?
8    THE DEFENDANT:  Yes.
9    THE COURT:  My goal today is to make sure that your
10 guilty plea, if you choose to enter it, is voluntary, knowing
11 and intelligently made.  I want to make sure that you
12 understand the rights you have, the options that are available
13 to you and the consequences of pleading guilty.
14    Okay?
15    THE DEFENDANT:  Yes.
16    THE COURT:  I'm going to do that by asking you a
17 series of questions, or maybe telling you a bunch of things
18 and then asking you if you understand what I'm saying.
19    Okay?
20    THE DEFENDANT:  Okay.
21    THE COURT:  And it is important that you answer yes
22 or no, so I appreciate you doing that.
23    I am going to first have you placed under oath.
24 Please understand that by taking this oath, you're swearing to
25 tell the truth, and if you were to say something today that

1  was untruthful, you could be prosecuted for making that false

2  statement.

3          Okay?

4          Go ahead, please.

5          THE CLERK:  Raise your right hand.

6                          - - -

7                  EDUARDO GUTIERREZ,

8  Defendant herein, having been first duly sworn, was examined

9  and testified as follows:

10                         - - -

11         COURTROOM DEPUTY:  Thank you.

12         THE COURT:  All right.  First of all, Mr. Gutierrez,

13 tell me how old you are.

14         THE DEFENDANT:  42.

15         THE COURT:  And where were you born?

16         THE DEFENDANT:  In Mexico.

17         THE COURT:  How far did you go in school?

18         THE DEFENDANT:  I didn't go to school hardly at all.

19 I didn't have an opportunity to go to school.

20         THE COURT:  Okay.  The reason I ask about that is I

21 want to get an understanding about your ability to read or

22 write.

23         Can you read and write in Spanish?

24         THE DEFENDANT:  I know how to read, but I really

25 don't write very well.

```
1            THE COURT:  Okay.  During the course of this case,

2   has your lawyer provided you paperwork, maybe a copy of the

3   indictment, a copy of the plea agreement, maybe other

4   documents in this case?  Has he done that?

5            THE DEFENDANT:  No.

6            THE COURT:  Has he reviewed them with you?

7            THE DEFENDANT:  Yeah.  We've talked about it on three

8   different occasions and explained why I'm here.

9            THE COURT:  Okay.  Have you been able to go over

10  things like the indictment with him?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Okay.  And have you been able to

13  understand the charges against you in the indictment by

14  spending time with your lawyer?

15           THE DEFENDANT:  Yes.

16           THE COURT:  Okay.  In the last 24 hours, have you had

17  any alcohol, pills, medicine or drugs of any kind?

18           THE DEFENDANT:  No, I haven't had anything.  But I --

19  I do have some problems with my teeth and I have some other

20  sickness.  I have a hernia.  I have sent them requests, but

21  they say no, only if it's an emergency.

22           THE COURT:  Okay.  I understand that.  And I'm sorry

23  about that.

24           What I really want to make sure is that you're not

25  taking any alcohol, medicine or drugs that might affect your
```

```
 1  ability to understand what you're doing.

 2          THE DEFENDANT:  No, that's fine.

 3          THE COURT:  Okay.  Have you recently been treated for

 4  either alcoholism or a drug addiction?

 5          THE DEFENDANT:  No.  No, I've never taken any drugs

 6  or --

 7          THE COURT:  Have you ever been hospitalized for any

 8  mental illness?

 9          THE DEFENDANT:  No.

10          THE COURT:  Mr. Ghali, has your client told you

11  anything about medication, pills, drugs, alcohol or other

12  factors that might affect his actions today?

13          MR. GHALI:  No, Your Honor.

14          THE COURT:  Do you have any doubt as to his

15  competency to plead guilty?

16          MR. GHALI:  I do not, Your Honor.

17          THE COURT:  Thank you.

18          I want to talk with you, Mr. Gutierrez, about a

19  number of rights that you have under the Constitution and the

20  laws of the United States.  I want to make sure that you

21  understand that if you enter a guilty plea today, you will be

22  giving up these rights.

23          Okay?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  First, you have a right to plead not
```

1   guilty and to maintain that plea.  No one can force you to

2   plead guilty.

3           Do you understand that?

4           THE DEFENDANT:  Yes, I understand.  But I know I made

5   a mistake and I'm pleading guilty.

6           THE COURT:  Okay.  Before we get there, let me make

7   sure you understand your other rights.

8           THE DEFENDANT:  Okay.

9           THE COURT:  It includes the right to a speedy, public

10  trial by a jury.

11          Do you understand that you have that right?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  You also would have the right at the

14  trial to be presumed innocent of the charges.  I would tell

15  the jury that they had to presume you innocent.  You have a

16  right to have the government bear the burden of proof, which

17  means they have to prove your guilt beyond a reasonable doubt.

18          Do you understand that?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  You don't have to prove anything.  The

21  government would have to prove that you committed the crime

22  and they would have to prove it beyond a reasonable doubt.

23          Okay?

24          THE DEFENDANT:  Yes.

25          THE COURT:  At the trial, you would also have the

1  right to the assistance of counsel, meaning a lawyer to help

2  you.  You could continue to be represented by Mr. Ghali, but

3  if you and he had a falling out or a disagreement, you could

4  either hire another lawyer, or if you couldn't afford that, I

5  would appoint somebody else to represent you, but what you

6  need to understand is that you would have the right to the

7  assistance of counsel.

8            Do you understand that?

9            THE DEFENDANT:  Okay.

10            THE COURT:  Okay.  And with the assistance of

11  counsel.  You'd have the right to do a number of things at

12  trial.

13            First of all, you'd have the right to see and hear

14  all of the evidence.  Nothing would be secret from you.

15            Second, you would have the right to challenge the

16  evidence by asking witnesses questions.

17            Third, you would have a right to call your own

18  witnesses and present your own evidence, if you wanted to do

19  so.

20            Fourth, you would have the right to subpoenas from

21  the Court to compel people to come and testify or provide

22  evidence, even if they did not want to.

23            And fifth, you would have the right to testify

24  yourself, if you wanted to do so, or to remain silent.

25            Do you understand those rights?

```
1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Keep in mind, that no one could make you

3    testify, no one could stop you from testifying.  You and you

4    alone would decide if you wanted to testify.

5              Okay?

6              THE DEFENDANT:  Okay.  Yes, sir.

7              THE COURT:  You should also know that at the trial,

8    if you decided that you did not want to testify or did not

9    want to present any evidence, I would tell the jury they could

10   not use that against you, because as I said before, the

11   government has the burden of proof.  You have to prove

12   nothing.  So if you were to just decide not to present any

13   evidence or not to testify, I would tell the jury they could

14   not use that against you.

15             Do you understand that?

16             THE DEFENDANT:  Okay.  Yes, sir.

17             THE COURT:  Finally, you would have the right to have

18   the jury render a unanimous verdict.  That means that all

19   jurors would have to conclude that the government had proven

20   your guilt beyond a reasonable doubt, and if even one juror

21   concluded the government had not met its burden, you could not

22   be convicted.

23             Do you understand that?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  If you decide to plead guilty today, you
```

1  will be giving up your right to a trial and all of these other

2  rights that I've just gone over.  Instead of a trial, I will

3  simply enter a judgment of guilty and sentence you based upon

4  your guilty plea.

5          Do you understand that?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Is that what you want to do?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  You will still have the right to an

10  attorney, you can still be represented by Mr. Ghali, but his

11  job will change.  He'll be trying to get you the best sentence

12  rather than defending you on the charges.

13          Do you understand that?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  In addition, in order to plead guilty,

16  you have to give up your right to remain silent.  You can't

17  enter a plea unless you admit to committing the crime.

18          Do you understand that?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  All right.  There are some other things

21  that could happen as a result of a guilty plea.  Some of these

22  might not apply to you, but please listen carefully.

23          First, if you are on probation or parole, they could

24  be revoked as a result of your decision to plead guilty.

25          In addition, if you're facing any other criminal

1  case, you could receive a sentence of imprisonment in this

2  case and a completely separate sentence of imprisonment in the

3  other case.

4          And, third, if you plead guilty today and you are

5  convicted sometime in the future of another offense, you might

6  face a longer prison sentence in the future because of today's

7  plea.

8          Do you understand these three things that could

9  happen to you?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  This is also a felony offense.  As a

12  result, it could deprive you of valuable civil rights, like

13  the right to vote, hold office or serve on a jury or to

14  possess any kind of firearm.

15          Do you understand that?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Since you told me you are from Mexico, I

18  want to make sure that you understand that if you are not a

19  citizen of the United States, then having pled guilty or

20  pleading guilty today would likely result in your deportation

21  or removal from the United States.

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  And could make it very difficult, if not

24  impossible, for you to lawfully return to the United States.

25          Do you understand that?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  In other words, when you're done, if you

3  are sentenced to a term of imprisonment, you will likely be

4  deported, and the fact that you pled guilty will prevent you

5  from lawfully coming back to the United States.

6          Do you understand that?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  I now want to talk with you about the

9  charges and the evidence that is at issue in this case.  I

10  want to make sure that you understand both.

11          Let me ask you again, have you reviewed the

12  indictment that has been returned against you?

13          THE DEFENDANT:  Yes, he told me what it was about.

14          THE COURT:  Did your lawyer talk with you about it

15  and explain it to you?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Okay.  I'm now going to ask the Assistant

18  United States Attorney to outline the crime to which you are

19  pleading guilty and to tell me the elements of the offense,

20  that is what they would have to prove in order to convict you.

21  Please listen closely.  I want to make sure that you

22  understand the crime that you are admitting to committing.

23          Okay?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  Go ahead, sir.

1          MR. BROCKINGTON:  Your Honor, the defendant is

2    entering a negotiated guilty plea to Count One of the

3    indictment, that is a conspiracy to possess with the intent to

4    distribute at least 500 grams of methamphetamine.

5          The elements of conspiracy are as follows:

6          First, that two or more people in some way agreed to

7    accomplish a shared and unlawful plan, that the defendant knew

8    the unlawful purpose of the plan and willfully joined in it.

9          Now, in this case, Judge, the object of the unlawful

10   plan was to possess with the intent to distribute narcotics,

11   mainly methamphetamine, a Scheduled II controlled substance.

12         That plan has its own elements which are as follows:

13         That the defendant knowingly possessed a controlled

14   substance.

15         That the defendant intended to distribute the

16   controlled substances.

17         And that the weight of the controlled substances was

18   at least 500 grams of a mixture and substance containing a

19   deductible amount of methamphetamine.

20         THE COURT:  Thank you.

21         Do you agree with that, Mr. Ghali?

22         MR. GHALI:  Yes, Your Honor.

23         THE COURT:  All right.

24         Sir, Mr. Gutierrez, do you understand, what the

25   government is charging you with in Count One?

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  You understand that conspiracy charge?

 3              THE DEFENDANT:  Yes, sir.

 4              THE COURT:  Did you understand the way that the

 5    government explained it?

 6              THE DEFENDANT:  Yes, sir.

 7              THE COURT:  Is it what you expected to plead guilty

 8    to when you came to court today?

 9              THE DEFENDANT:  Yes, sir.

10              THE COURT:  All right.  Sir, I now am going to ask

11    the United States to tell me the evidence they would present,

12    that is what they would show you did if this case went to

13    trial.  I want to make sure that there's a factual basis for

14    your plea.

15              So I'm going to ask the United States to tell me what

16    they would show you did and I'm going to ask you whether you

17    admit to it.

18              Okay?

19              Go ahead, sir.

20              MR. BROCKINGTON:  Your Honor, if this case were to be

21    tried, the government would prove the following facts through

22    admissible evidence beyond a reasonable doubt:

23              That evidence would be presented in the form of

24    physical and electronic surveillance, intercepted wire and

25    electronic communications, the testimony of cooperating
```

1  coconspirators and seized contraband.

2        Beginning in late 2019, agents with the DEA were

3  investigating the distribution of narcotics in the Northern

4  District of Georgia.  That investigation began by looking at

5  the activity of codefendant Christopher Jones, believed to be

6  a low-level trafficker who supplied narcotics to individuals

7  in Albany, Georgia.

8        Agents began a wiretap investigation and quickly

9  identified Jones's primary supplier, that is codefendant Kevin

10 Clark.

11       As agents expanded the wiretap investigation, agents

12 determined that Clark was a prolific trafficker, often

13 spending all day on the telephone negotiating drug

14 transactions.

15       Specifically, agents identified the defendant as a

16 mid-level -- excuse me, agents identified Clark as a mid-level

17 distributor of cocaine and other narcotics.

18       Clark's modus operandi was to connect his customers

19 with narcotics suppliers and essentially broker drug deals

20 using his mobile device.

21       Agents switched the focus of their investigation to

22 Clark and utilized multiple investigative tools.  Through that

23 investigation, agents determined that Codefendant Clark relied

24 on three separate sources of supply to replenish his

25 narcotics, and agents successfully identified and apprehended

1  all three.

2       One of the sources of supply was the defendant in

3  this case, Mr. Eduardo Gutierrez, also known as Santos

4  Campos-Ramirez.

5       Ultimately, the investigation resulted in the arrest

6  of eight individuals and the seizure of drugs, vehicles,

7  firearms, United States currency and jewelry.

8       The defendant's involvement and his role in the

9  conspiracy can be demonstrated through enforcement activity

10 that took place in the Northern District of Georgia in July of

11 2020.

12      Specifically between July 17th and July 20th, 2020,

13 agents intercepted a series of electronic and wire intercepts

14 indicating that the defendant in this case planned to sell ten

15 kilograms of methamphetamine to Codefendant Kevin Clark for

16 roughly $11,000 to $12,000 per kilogram.

17      In turn, Codefendant Clark contacted another

18 Codefendant, Perfecto Neri-Diaz and offered to include him in

19 the transaction.

20      Based on these intercepted communications, agents

21 with the DEA established surveillance outside of 1290 Shanter

22 Trail in Atlanta, Georgia, which is located in the Northern

23 District of Georgia.  That was on July 20th, 2020.

24      That day, agents observed three vehicles driving in

25 tandem towards this residence.  A Toyota Tundra driven by

Perfecto Neri-Diaz, a Mercedes G Wagon driven by Codefendant

Kevin Clark, the third vehicle was a Nissan Altima.

Agents contacted the Georgia State Patrol to assist

in case interdiction at around 1:50 p.m.  By that time, a

silver Nissan Altima was seen leaving the driveway of 1290

Shanter Trail traveling towards Cascade Road and Interstate

285.

That Nissan Altima had previously been associated

with the defendant in this case, Mr. Gutierrez, also known as

Campos-Ramirez.

Around 2:00 p.m., troopers with the Georgia State

Patrol performed a traffic stop on that Nissan Altima and

subsequently a canine alerted to the presence of narcotics in

the vehicle.

During a search of the vehicle, in the rear trunk

compartment of the Altima, state patrol found a black

backpack, and inside that backpack were 12 rubber-banded

bundles of cash.

To be clear, ultimately no narcotics were seized from

the vehicle, but an official count of that cash was performed

later and the total was determined to be $116,995, again,

consistent with the sale of 10 units or 10 kilograms of

methamphetamine for between $11,000 and $12,000.

THE COURT:  And what was the date of that sale?

MR. BROCKINGTON:  That was July 20th of 2020, Judge.

1          THE COURT:  Mr. Ghali, do you have any disagreement

2     as to the evidence the government could present if this case

3     went to trial?

4          MR. GHALI:  No, Your Honor.  I'd just point out that,

5     you know, in particular, the July 20th event, I think

6     Mr. Gutierrez Campos-Ramirez admits that that happened.

7     There's some characterization about the source of supply

8     versus a role with finances in terms of the role with the

9     money that was seized.

10          I think the evidence is sufficient to establish a

11    conviction under Count One for a conspiracy and the defendant

12    does admit that the evidence is sufficient, but we might

13    disagree on the characterization of things like source of

14    supply and how to interpret certain communications.

15          But I think for the purposes of today, we have

16    agreement that the government's evidence would meet the

17    elements of the conspiracy offense in Count One.

18          THE COURT:  Well, I need to make sure that it does.

19    And so far, what I have been told is that your client was a

20    supplier of narcotics to Mr. Clark and that he was involved on

21    July 20, 2020, as part of selling 10 kilos of methamphetamine

22    to Mr. Clark.

23          Does your client deny having done that?

24          MR. GHALI:  It -- I don't know that -- I think what's

25    fair to say for today in terms of at least my understanding,

1 having spoken with my client, is that he admits to his role in

2 the conspiracy as it related to financing.

3     Now, when you say he sold, I don't know that my

4 client would admit that he himself conducted the sale as

5 opposed to had an awareness of the conspiracy, the purpose,

6 his role in the money.

7     But we can take a sidebar, and I can get to the

8 bottom of it, but at the level of conversations I've had with

9 my client, you know, the facts that I've kind of relayed are

10 ones that I know that he would agree to and admit to for the

11 purpose of the plea.

12     THE COURT:  Right.  Here's the problem.  The problem

13 is that the government has proffered to me generally about

14 their investigation and about the organization and about other

15 people that were in it.

16     So far I've heard one instance, one detailed instance

17 about this defendant's involvement that has to do with

18 methamphetamine.

19     Your client does not speak English and does not read

20 in English.  The charging documents are all in English.

21 Everything that's happening here is in English.

22     And yet, in order to plead guilty, he must admit that

23 he was part of this conspiracy with the people that have been

24 identified, that he entered it knowing the substance of the

25 conspiracy was to distribute controlled substances, and that

1 he knew or that the conspiracy involved at least 500 grams of

2 a substance containing methamphetamine, 5 kilos or more of a

3 substance containing cocaine and 500 grams or more of a

4 mixture and substance containing -- why are there two cocaine?

5 Oh, he is just identified in just the methamphetamine.

6      MR. BROCKINGTON:  Yeah, that's correct.  There are

7 two references to cocaine, Judge, because there are two --

8 some individuals are involved at an amount that would trigger

9 a ten-year mandatory minimum, some are involved in an amount

10 that would trigger a five-year mandatory minimum.

11      THE COURT:  Okay.  So he has to admit that the

12 conspiracy he was part of was at least 500 grams of

13 methamphetamine.

14      And to simply say he would admit that he was involved

15 in some type of finance way, they haven't identified him as

16 finance, and I want to have a very -- given the language

17 barrier, and what I believe to be an individual who is eager

18 to plead guilty, I have a limited role today.  I have two

19 things essentially I've got to do.

20      One, I've got to make sure he understands what he's

21 doing.

22      And two, I've got to make sure that there is actually

23 a factual predicate that's been laid out to me that he's

24 admitted to that satisfies the elements.

25      And the government's saying one thing and you're

1  saying, well, kind of, but not exactly, but it's enough.

2         MR. GHALI:  Well, at least with respect, Your Honor,

3  I think what my client would say is specifically everything

4  that AUSA Brockington identified about July 20th, the seizure

5  of over $100,000 seized from the car, that that was a

6  financial component that explains his role, that he was

7  involved in a conspiracy that involved an agreement with

8  others that were identified.  The purpose of the conspiracy

9  involved the sale of methamphetamine.

10         But there were just other aspects of the background

11  investigation that he was a source of supply that I don't

12  think are necessary for us to resolve factually for the

13  purpose of my client's guilty plea, and that's all I wanted to

14  allude to.

15         If the Court, you know, wants to --

16         THE COURT:  I'm sorry.  I think you are speaking

17  imprecisely.  You're using imprecise words, because I feel

18  like there's something that you think he did, but you don't

19  want to really tell me.  But I think that in somebody entering

20  a plea -- what's the mandatory minimum here?

21         MR. BROCKINGTON:  Ten years, Judge.

22         THE COURT:  I think we ought to speak with precision,

23  clarity and volume about what it is that was your client's

24  criminal culpability.

25         MR. GHALI:  All right.

1      THE COURT:  So tell me what he did, who he worked

2   with -- what he's willing to admit he did and who he worked

3   with and how he was involved on the July 20 incident.

4      MR. GHALI:  Well, I think I'll just repeat back to

5   what AUSA Brockington identified about the date of the

6   incident and the --

7      THE COURT:  So he was a source of supply of

8   methamphetamine to Mr. Clark?  He supplied methamphetamine to

9   Mr. Clark?

10      MR. GHALI:  Your Honor -- that's not what I said,

11   Your Honor, respectfully.

12      THE COURT:  Well, that's what he said.  That's what

13   Mr. Brockington said.

14      MR. GHALI:  If I could -- if I could -- if I could

15   just articulate this, Your Honor.

16      I agree with AUSA Brockington's recitation just

17   factually of the fact that there are intercepted

18   communications on that date on July 20th, that my client is on

19   those communications.

20      There are communications involving the sale and

21   procurement of methamphetamine, that is part of an illegal

22   conspiracy, and that there was over $100,000 of cash in a

23   vehicle that my client was driving on that day, that was

24   related to a transaction for the illegal purchase of

25   narcotics.

1          Now, in terms of whether he is globally a source of

2     supply, you know, across the board, I do not believe, based on

3     my conversations with my client, that he is -- that we are

4     prepared today to get into anything more than there is a

5     factual basis for the guilty plea.

6          We're happy to take a sidebar to kind of flesh out

7     beyond what is sufficient for the elements today, if that will

8     satisfy the Court, but I just wanted to make the record clear

9     that that conduct cleanly satisfies the elements, I think

10    meets the elements of a guilty plea.

11         THE COURT:  I don't think it does.

12         MR. GHALI:  And I think it fairly reflects my

13    conversations with my client.

14         THE COURT:  I don't think it does, because I still

15    don't know what you're admitting and your client is admitting

16    to doing.

17         MR. GHALI:  Well --

18         THE COURT:  You have used the passive voice.  There

19    were communications involving methamphetamine.  There was

20    $100,000 in cash that was seized.  I don't know.

21         MR. GHALI:  We can take a sidebar, Your Honor.

22         THE COURT:  No.  Let me finish.  I'm not taking a

23    plea from an individual who has almost no education, who seems

24    extremely eager to enter a plea, because he wants to get this

25    behind him, who does not speak English and therefore cannot

1 read the indictment himself.

2      And that when the government identifies him as one of

3 Mr. Clark's sources of supply and then indicates that he was

4 speaking with Mr. Clark to sell 10 kilograms of meth to

5 Mr. Clark, that now, when you're giving me this, hey, we think

6 it's enough, but it wasn't exactly what the government says it

7 is, I'm not going to do that, because I want this to be

8 crystal clear.

9      Is he going to qualify for safety valve?

10      MR. BROCKINGTON:  There is a safety valve provision

11 in the plea agreement.  I think that really it's going to come

12 down to his criminal history and that's something that we

13 would rather not, in terms of -- in terms of -- in terms of

14 determining what his criminal history is, because there are a

15 number of aliases, we think that --

16      THE COURT:  You need to wait?

17      MR. BROCKINGTON:  Yeah.  We're just going to wait and

18 see.  Ultimately, if he satisfies all five of the criteria,

19 then he must get safety valve.  Is it a possibility?  Yes.

20 There's nothing that I see here today --

21      THE COURT:  I have a ten-year mandatory minimum.  I

22 want this to be simple.  I'll bet you, I'll bet you-all

23 anything --

24      Tell me your name again, sir.

25      SPECIAL AGENT:  Special Agent Bruce Hernandez.

1          THE COURT:  I think you think this is pretty simple,

2    right?

3          SPECIAL AGENT:  I don't know, sir.

4          THE COURT:  I think it's pretty simple.  Either he

5    was part of a conspiracy on that day in July to sell drugs and

6    he was a source of supply or he had some other specific role.

7    Maybe he had the money, I don't know.

8          But if he's selling, then he ought to be able to tell

9    us that.  I thought he was the source of the supply.  If not,

10   let's find out what he did.

11         But I understand, Mr. Ghali, that you may need more

12   time to talk with your client, but I suspect that you don't

13   have enough of the facts from your client to be able to answer

14   my questions with precision.

15         But I demand a high level of precision and a high

16   level of exactitude in what is being proffered to me and what

17   a defendant admits to, so that eight and a half years down the

18   road if he's still in prison, there's something in black and

19   white that says I did my job in making sure that I did one of

20   the two things I have to do today, making sure that he admits

21   doing what constitutes the crime that he's alleged, not just

22   we agree it's enough.

23         Okay?

24         So we're going to reset this for another day.

25         MR. BROCKINGTON:  Well, before we do that, Judge, I

1  have -- if the parties are allowed to confer, I think we may

2  be able to --

3      THE COURT:  I appreciate that.  And normally I would

4  say that, and I did that with a couple of your colleagues

5  yesterday, we gave them the rest of the day to talk about it.

6      But my concern is he speaks very little English.  I

7  want there to be very clear communication.  I would like you

8  to write down what it is you think he did.  I would like

9  somebody to go over it with him, and I would like to have a

10 very detailed simple thing.

11     You had a lot you told me about what other people

12 did.  You really gave me one generalization about him that he

13 was one of the sources of supply and then one specific

14 incident in July, when you said he was supplying.  I don't

15 think that's been admitted to.

16     MR. BROCKINGTON:  And if I -- if I may, Judge, I

17 think that the issue -- and I respectfully -- with respect to

18 opposing counsel, in terms of the clarifications of whether or

19 not someone is a source of supply, because these are

20 multilevel and multi -- in terms of these organizations,

21 whether or not Mr. Gutierrez -- whether or not the individual

22 is the individual who has his hands on the 10 kilos of

23 methamphetamine or whether he's the individual that just

24 drives to retrieve the money or whether he's the individual

25 that is going to take the money and deposit it into the bank,

1  there are so many arms and so -- and so many members -- cogs

2  in this wheel, that I think that what Mr. Ghali is trying to

3  say is that while the government and the defendant may

4  disagree with exactly what his role is in terms of what source

5  of supply means, nevertheless, there were communications

6  between a codefendant and the defendant on a device that the

7  defendant admits using and those -- those communications that

8  were intercepted over that device suggested that this

9  transaction was going to take place on July 20th.

10        Ultimately, agents surveilled the residence in the

11  Northern District of Georgia, they saw the vehicle that was

12  driven, ultimately that was driven by the defendant arrive,

13  and then leave that -- what -- suspected transaction.

14        While no methamphetamine was actually seized, there

15  were $116,000, which was consistent with the purchase price

16  and so --

17        THE COURT:  I understand.  I understand.  It's

18  great -- it's great evidence.  It's great evidence and I think

19  a jury would follow that.

20        What I'm asking is does the defendant admit to it.

21  Does the defendant admit that he was part of a discussion that

22  day in order to procure 10 kilograms of methamphetamine, and

23  that he then arrived that day to I guess pick up the money?  I

24  don't know.

25        But what I've got is -- what I had, and I wrote it

1  down as Mr. Ghali was talking, I have a lot of passive voice.

2  Passive voice is the cat was run over.  Active voice is I ran

3  over the cat.  I think we're dealing with somebody who's

4  admitting to committing a crime that's very serious that could

5  put him in jail for ten years.

6          I think we ought to have active voice statements from

7  you about what he did and from him either admitting or not.

8          But I'm not accepting a passive voice plea.  I'm not

9  going to do it, not with this defendant on these facts.

10          MR. GHALI:  Your Honor, if -- if I may, I just want

11  to state for the record there is absolutely no dispute from

12  the defendant that he engaged in conduct that is consistent

13  with Count One.  And let -- I know you don't like passive

14  voice, Your Honor, but I just want to make this clear. I

15  never --

16          THE COURT:  No.  I need to make my point clear to you

17  one last time.

18          MR. GHALI:  Okay.

19          THE COURT:  I do not do my job by accepting the

20  parties' representation to me as to what they agree.

21          Rule 11 says that my job here is not to make sure

22  that the parties agree, but that I have an obligation to make

23  sure that there is a factual basis for the plea, not an

24  agreement between the lawyers or even an agreement between the

25  defendant.  That's an Alford plea.

```
 1            I have an obligation to make sure that there is a
 2    factual basis, which means the government says what he did,
 3    and the defendant either admits to it or tells me what he
 4    thinks about it.
 5            But it is not enough to say we agree that there's
 6    enough to satisfy the offense.  I may ask that in the end,
 7    when you-all tell me what the facts were.  I often say do you
 8    agree that that's enough?  Do you agree that that's enough?
 9    But that's after I reach a conclusion that it's enough.
10            And I don't just take the parties' words, because,
11    you know what, the defendant may decide three years in to a
12    ten-year sentence that he didn't really do what was said.
13            And if that's the case, he's going to file something,
14    and it's going to say either that he says this is what
15    happened and I want there to be a record three years, four
16    years, eight years down the road that I said tell me plainly
17    what it is you did, and that I have a statement about it.
18    That's all.
19            Okay?
20            So maybe -- I think you can get there.  I don't think
21    it's very difficult.
22            But I don't think -- I don't know if it's because of
23    the difficulty of seeing people, I don't know if it's because
24    of the difficulty of language barriers, but there does not
25    seem to be enough familiarity with this defendant's role for
```

 1   me to do one of the really two things I do, which is to make

 2   sure that there's a factual basis.

 3        I know Rule 11 says all these other things that I

 4   have to do, but it really comes down to making sure he

 5   understands things and making sure there's a basis.

 6        Okay?

 7        MR. BROCKINGTON:  Certainly.

 8        And, Judge, your point is well taken in terms of the

 9   two things that you have to do, and the gravity of the

10   situation is well taken, I think on both -- on behalf of -- on

11   behalf of both the government and the defense.

12        My only point is that I think that in order to get to

13   where you are satisfied that he is admitting to the conduct

14   that he did that would support a conviction for Count One, I

15   think that if Your Honor is -- would be amenable to a short

16   recess, it's something that we can handle.

17        I'm just concerned about the resources in sending him

18   back to RAD, trying to schedule this again, only to come back

19   and have virtually the same -- not the same, obviously, but

20   virtually the same factual basis just with a little bit more

21   clarity, I wonder if we can get there right now.

22        THE COURT:  I'll give you five minutes.  I'll give

23   you five minutes.  I want plain, declaratory statements using

24   active voice.

25        MR. BROCKINGTON:  That's clear.

1          (Whereupon, a recess was taken.)

2          THE COURT:  All right.  Mr. Gutierrez, please listen

3   closely to what Assistant United States Attorney Brockington

4   is about to tell me that you did.

5          And then I'm going to ask you whether you agree to

6   that.

7          Okay?

8          Sir?

9          MR. GHALI:  Your Honor, I'm happy to -- because I

10  just spoke with my client and I've heard what AUSA Brockington

11  said, and I'm happy to communicate with you the facts that the

12  defendant believes provides not only a factual basis for the

13  guilty plea, but explains the conduct that we were discussing

14  before we went off the record.  If that's okay with the Court.

15         THE COURT:  Okay.

16         MR. GHALI:  The days that lead up to July 20th, the

17  defendant talked on the phone with a contact in Mexico.  That

18  contact in Mexico told the defendant that the defendant should

19  pick up money from Mr. Clark's house.  That money that the

20  defendant was supposed to pick up was drug money, specifically

21  methamphetamines.  And both -- and it was referred to as

22  windows, quote.

23         I know I used the passive voice there, but I think

24  that -- you know, some of it's a recollection issue, so I

25  can't tell you specifically who used it, but that's part of

1  how the defendant understood that it involved methamphetamine.

2        There was -- the defendant spoke -- or rather not

3  spoke -- communicated with Mr. Clark prior to picking up what

4  ended up being over $100,000 of -- from Mr. Clark on

5  July 20th.

6        And when he picked up that money, the defendant knew

7  that it was money that Mr. Clark -- or that it was -- that it

8  was drug money.

9        And he was subsequently -- the defendant, was stopped

10 and arrested by law enforcement on that day precisely the way

11 that AUSA -- AUSA Brockington explained.  The defendant didn't

12 know where the money was supposed to go next, because he

13 hadn't really been told.

14        So those are the facts that the defendant will agree

15 to, that in my estimation, provides a factual basis for the

16 conduct alleged in Count One.

17        THE COURT:  All right.

18        So, Mr. Brockington, he was not a source of supply?

19        MR. BROCKINGTON:  Judge, again, that

20 characterization -- I don't want to get hung up on it, but as

21 far as Mr. Clark was -- Codefendant Clark had three

22 individuals that he would contact when he was in search of

23 narcotics.  Okay?

24        THE COURT:  Including Mr. Gutierrez?

25        MR. BROCKINGTON:  Including Mr. Gutierrez.  Now --

```
 1              THE COURT:  Is that right, Mr. Ghali?

 2              Did your client talk with Mr. Clark in order to

 3    arrange to sell Mr. Clark narcotics?

 4              MR. GHALI:  It is correct that there are

 5    communications with Mr. Clark, what I think -- I agree with

 6    AUSA Brockington, I don't want to get hung up on is the term

 7    of art source of supply or if there's communications where

 8    there's different interpretations, are you connecting people,

 9    is it a sale.  I don't know the answers to all those

10    questions.

11              And I think my client has a view on how he would

12    characterize some of those communications, which were

13    intercepted, and we do not dispute that they exist, but I do

14    not believe being a source of supply is an element of Count

15    One, and so I don't know the answer to that question,

16    Your Honor.

17              THE COURT:  I'm going to let y'all figure it out.

18    I'm not going to accept the plea today.  I'm going to let

19    you-all figure out exactly what he did.

20              I'm not trying to say that a source of supply is some

21    kind of difficult term of art, it's not.  We all know what it

22    is.  We all know there could be multiple sources of supply or

23    you can have one role within a source of supply.

24              But the government tells me that when Mr. Clark

25    wanted to buy drugs, one of the people that he called was
```

1    Mr. Gutierrez.

2         And the way this has been explained to me is that on

3    the day that he talked with him, he was talking not about

4    getting drugs, but about picking up money and that his

5    instructions to pick up the money came not from Mr. Clark, but

6    from somebody in Mexico.

7         So I'm going to let you-all take the time to give me

8    a more complete set of what happened, and, and it will be the

9    relevant conduct in the PSR.  I'm not going to go back in the

10   PSR and go back to imprecise things.

11        Okay?

12        So I would like you-all to figure out what you mean

13   by a source of supply.

14        But my understanding from Mr. Brockington was that

15   when Mr. Clark wanted drugs, he called Mr. Gutierrez, right?

16        MR. BROCKINGTON:  Mr. -- when Kevin Clark wanted

17   drugs, there were three individuals that the government

18   identified that he would reach out to, one of whom was -- was

19   Mr. Gutierrez; however, whether or not that means that

20   Mr. Gutierrez was a source of supply or whether he was --

21        THE COURT:  Well, of course he was a source of supply

22   or broker, right.

23        MR. BROCKINGTON:  Or if he just knew someone who knew

24   someone who knew someone, from Mr. Clarks' -- from the

25   perspective of Clark, and that was where the focus of the

1  investigation was, that was one of the individuals he would

2  contact, if, per se, Mr. -- codefendant Neri-Diaz didn't have

3  narcotics, another coconspirator, unindicted coconspirator

4  didn't have narcotics, he would contact Mr. Gutierrez.

5      I will admit that in terms of the three of them,

6  Mr. Gutierrez was very much lower on the pole in terms of --

7  in terms of the ranking of the frequency with which Mr. Clark

8  would contact him.

9      This particular narcotics transaction is somewhat

10  unique in that Mr. Clark was typically a cocaine trafficker.

11      We're talking about methamphetamine now.  And this

12  particular transaction was a methamphetamine -- where --

13  what -- Mr. Gutierrez was aware that methamphetamine was

14  available.  Contacted Clark.  Clark did not traffic in

15  methamphetamine.  Clark contacted his codefendant, Perfecto

16  Neri-Diaz, one of his other cocaine sources of supply.

17      THE COURT:  Is that the guy in Mexico that you're

18  tying to --

19      MR. BROCKINGTON:  Not the guy in Mexico.  That's a

20  codefendant who's been indicted in this particular case.

21      And to be clear, Your Honor -- well, we wanted to --

22  I guess it's always a decision on behalf of the government to

23  determine how judicious it wants to be with setting out a

24  factual basis.  I don't want to try the case right now, but at

25  the same time, I want to provide sufficient facts that would

1  satisfy a factual basis for the plea.

2        THE COURT:  Sure.

3        MR. BROCKINGTON:  So --

4        THE COURT:  Let me just say this.  I think, I think

5  that you-all interpreted the use of the word "windows" in the

6  July 20th call as being drugs.

7        MR. BROCKINGTON:  It's coded conversation for crystal

8  methamphetamine.

9        THE COURT:  Okay.  He tells me windows means money.

10 No?

11       MR. GHALI:  If I said that, I misspoke.

12       THE COURT:  Oh, I thought you said it was drug money,

13 which they referred to as windows.

14       MR. GHALI:  I meant methamphetamine.  I was so

15 focused on active voice, I got distracted.  I really -- I

16 really just meant meth -- methamphetamine was windows, which

17 I -- I am familiar with that as well.

18       THE COURT:  Mr. Gutierrez, do you know the

19 transaction they are speaking about on July 20th of 2020?

20       THE DEFENDANT:  Yes.

21       THE COURT:  Were you involved in that day in a drug

22 transaction?

23       THE DEFENDANT:  Yes.  I went and picked up the money

24 that the police took me from later.

25       And they -- when they stopped me, they asked me to

1  sign a paper saying it wasn't mine, and I signed it, because

2  it wasn't mine, my money.

3          THE COURT:  Whose money was it?

4          THE DEFENDANT:  It belonged to a fellow who I knew

5  from back in Mexico.

6          THE COURT:  I'm going to let you-all give me a

7  written statement, agreed-upon set of facts as to what this

8  defendant did within the conspiracy.  And I would like that to

9  be what then controls his relevant conduct.

10         Okay?

11         MR. BROCKINGTON:  We are perfectly fine with coming

12 up with a factual basis.

13         THE COURT:  Thank you.

14         MR. BROCKINGTON:  However, Your Honor, I think that

15 it would be improper for that to control the relevant conduct.

16 That is where -- that's a step -- I don't see why we would

17 take that next step for it to control the relevant conduct.

18         MR. GHALI:  And, Your Honor, I would object as the

19 defendant that this is a sentencing dispute about relevant

20 conduct, because there may be -- I mean, I think that that's

21 why you have sentencing disputes.

22         THE COURT:  Okay.  I'm telling you what I would like.

23 I don't think right now that I can reach a conclusion that the

24 defendant is admitting to conduct.  I think I could do it.  I

25 think I could ask him the questions to get him there.  I think

UNITED STATES DISTRICT COURT

1  this defendant is accepting responsibility for what he did,

2  but it's not my role to do that.

3         So you-all can do it.  You-all can give it to me and

4  I'm going to, in all likelihood, accept it as the relevant

5  conduct, I'm telling you that.  Because I'm not going to get

6  here and have imprecision placed upon this defendant with the

7  severity of his -- of the case that he's facing.

8         Okay?

9         There's no reason to take it as two bites.  We all

10  know where we're headed.  And we're either getting there

11  collectively or we're not.

12         Okay?

13         Everybody got it?

14         MR. BROCKINGTON:  Understood, Judge.

15         THE COURT:  Thank you.

16

17         (Whereupon, the proceedings were adjourned at 4:19

18  p.m.)

19

20

21

22

23

24

25

REPORTERS CERTIFICATE

    I, Jana B. Colter, Official Court Reporter for the
United States District Court for the Northern District of
Georgia, with offices at Atlanta, do hereby certify:

    That I reported on the Stenograph machine the
proceedings held in open court on August 25, 2021, in the
matter of *United States of America v. Eduardo Gutierrez*, Case
Number 1:20-CR-00408; that said proceedings in connection with
the hearing were reduced to typewritten form by me; and that
the foregoing transcript (38 Pages) is a true and accurate
record of the proceedings.

    This the 22nd day of November, 2021.


                              _____
                              /s/ Jana B. Colter, FAPR, RMR, CRR, CRC
                                   Official Court Reporter